

FILED

DEC 1 3 2006

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| HOT STUFF FOODS, LLC, F/K/A ORION FOOD SYSTEMS, LLC, | \* \* \* | CIV. 06-4085 |
| Plaintiff, | \* \* \* | |
| -vs- | \* \* | |
| MEAN GENE'S ENTERPRISES, INC., GENE OKERLUND, BLAZE OKERLUND, TODD OKERLUND, AND MARK MCKEE, | \* \* \* \* \* \* | MEMORANDUM OPINION AND ORDER RE: MOTION TO CANCEL TRADEMARK REGISTRATIONS AND REQUEST FOR PERMANENT INJUNCTION |
| Defendants, | \* \* | |
| and | \* \* | |
| EUGENE OKERLUND, | \* \* | |
| Counterclaim Plaintiff, | \* \* | |
| v. | \* \* | |
| HOT STUFF FOODS, LLC, | \* \* | |
| Counterclaim Defendant. | \* \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PROCEDURAL BACKGROUND

Plaintiff, Hot Stuff Food. LLC, (Hot Stuff) filed a motion for preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. Doc. 3. Hot Stuff sought injunctive relief against Defendants Mean Gene's Enterprises, Inc., Gene Okerlund, Blaze Okerlund, Todd Okerlund and Mark McKee preventing any further use of the Mean Gene's Burgers® and Mean Gene's Pizza™ marks and trade dress. Hot Stuff also sought injunctive relief against Defendants Mark McKee and Blaze Okerlund to prevent them from any further or continued breach of their severance and non-compete agreements with Hot Stuff. After a hearing was held on May 25, 2006, and after the parties

submitted a Stipulation for Temporary Restraining Order (Doc. 24), the Court entered a Temporary Restraining Order. The Temporary Restraining Order (Doc. 26) provided that Defendants not contact Hot Stuff Foods licensees or franchisees, that Defendants not make business contacts for the purpose of selling Mean Gene Enterprises, Inc., product, and that Defendants not use or cause to be published the "Mean Gene's Burgers" or "Mean Gene's Pizza" names or logos. By its terms, the Temporary Restraining Order was effective through the date of the hearing on Plaintiff's Motion for Preliminary Injunction.

A Court trial was held on Plaintiff's Motion for Preliminary Injunction on June 19, 20 and 21, 2006. At the completion of the trial on June 21, 2006, The Court orally announced that a preliminary injunction would issue prohibiting Defendants' use of the Mean Gene's Burger registered trademarks. The Court reserved ruling on the issues concerning the common law trademark claim and claims regarding covenants not to compete. The Court issued a Memorandum Opinion and Order Granting Preliminary Injunction in Part (Doc. 56) which was consistent with its rulings from the bench.

On June 29, 2006, Defendants filed "Defendants' Joint Answer and Counterclaim of Eugene Okerlund." Doc. 59. In his counterclaim, Defendant Gene Okerlund seeks an Order under 15 U.S.C. § 1119 directing the Commissioner of Patents and Trademarks to cancel the trademark registration of MEAN GENE'S BURGERS, Registration No. 2,327,876, which covered franchising services, and to cancel the trademark registration of MEAN GENE'S BURGERS, Registration No. 2,188,577, which covered restaurant services. Defendant Gene Okerlund also brought counterclaims for breach of covenant of good faith and fair dealing, trademark infringement, breach of contract, false advertising, trademark dilution, and violation of the right of publicity. On July 13, 2006, Defendant Gene Okerlund filed a Motion to Cancel Trademark Registrations for Mean Gene's Burgers. Doc. 62.

On Friday, August 4, 2006, this Court heard additional evidence regarding Hot Stuff's request for a permanent injunction. At the end of the August 4, 2006, hearing, counsel for Defendants requested the opportunity to submit a reply to Plaintiff's Brief in Resistance to Defendants' Motion to Cancel Trademark Registration (Doc. 70). Also, at the end of the hearing, this Court advised that it would also consider briefs addressing what, if any, equitable considerations

2

are applicable in  the determination of whether any of the parties are entitled to any of the relief requested.

This Court has jurisdiction over the trademark claims pursuant to 15 U.S.C. § 1121[1], and 28 U.S.C. §§ 1331, 1338[2] and has supplemental jurisdiction pursuant to 28 U.S. C. § 1367.

## FACTUAL BACKGROUND

Defendant and cross-claimant Gene Okerlund has been an announcer, interviewer and/or host to televised professional wrestling for several years. In 1978, during an interview, Jesse Ventura said to Gene Okerlund, "You know something, you are mean, Gene." Since that time Gene Okerlund has been called "Mean Gene" in his work with professional wrestling, and  at family gatherings,  social affairs and charity appearances.

Gene Okerlund first worked with the American  Wrestling Association.  In 1983 Gene Okerlund began working full time as a wrestling announcer and host with the World Wrestling Fedration, which became the World wrestling Entertainment in 1999. Gene Okerlund was the ongoing host of Wrestling Mania 1 through 23, and hosted a number of weekly wrestling shows. In 1993, Gene Okerlund began working for World Champion Wrestling which broadcast wrestling programs on cable stations, TNT and TBS. In 2001 Gene Okerlund went back to work with the World Wrestling Entertainment. Gene Okerlund's  involvement with the World Wrestling

---

[1]15 U.S.C. § 1121(a) provides: "The district and territorial courts of the United States shall have original jurisdiction ... of all actions arising under this chapter [trademarks], without regard to the amount in controversy or to diversity or lack of diversity of the citizenship of the parties.

[2]28 U.S.C. § 1338(a)and (b) provide:

(a) The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks. Such jurisdiction shall be exclusive of the courts of the states in patent, plant variety protection and copyright cases.
(b) The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent, plant variety protection or trademark laws.

Entertainment opened up other entertainment avenues, and Gene Okerlund has voiced television commercials, done commercial work for manufacturers associated with wrestling, appeared on various television shows, and played himself, "Mean Gene," in a number of movies. In April of 2006, Gene Okerlund became the first announcer to be introduced into the World Wrestling Entertainment Hall of Fame.

Orion Foods Systems, Inc., (Orion), a wholly owned subsidiary of Schwan Sales Enterprises, was in the business of marketing multiple branded food systems in non-traditional locations, a majority of which were franchised operations. Jeff Okerlund, Gene Okerlund's nephew, was the President of Orion Foods from 1984 to 2003. Orion was sold to Kohlberg Investment Fund in 2002, and then sold in 2006 to Allied Capital. Orion became Hot Stuff Foods, LLC.

Gene Okerlund became involved with Orion through his nephew, Jeff Okerlund, when Orion wanted to use the name, Mean Gene, for a hamburger Orion wanted to market. Wrestling was thought to be popular with the demographic target for the burgers. Gene Okerlund eventually signed a Personality Endorsement Agreement with Orion in November of 1997. The 1997 Personality Endorsement Agreement, which had a term of five years, provides:

> Endorser grants to Orion the exclusive right to use the "Mean Gene's" name, personality, picture, portrait. likeness, voice and endorsement on and in connection with the advertisement, promotion and sale of Orion Food Products at Mean Gene's Units in any marketing area in which Orion or its licensees now or hereafter during the term of this Agreement do business.

In 2001, Orion began offering Mean Gene's pizza. Pursuant to the Personality Endorsement Agreement, Gene Okerlund appeared at openings and other events at the Mean Gene's units. In addition he was involved with the development, control, advertising and branding of the Mean Gene's products sold by Orion, although there was no contractual provision requiring Orion to follow any of his suggestions. Hot Stuff has entered in to contracts with over two hundred licensees and franchisees doing business under the brand Mean Gene's Burgers and Mean Gene's Pizza. Approximately 40 of these entities are "Mean Gene's Burgers." Hot Stuff has generated more than 26 million dollars of sales of Mean Gene's products, and Gene Okerlund has collected more than a million dollars in royalties.

In January of 2002, Gene Okerlund entered into a "Mean Gene's Personality Endorsement

4

Agreement" with Orion. This 2002 Agreement superceded and replaced all prior endorsement agreements between Orion and Gene Okerlund. Like the 1997 Personality Endorsement Agreement, the 2002 Agreement granted Orion the exclusive right to use the "Mean Gene's" name, personality, picture, portrait, likeness, voice and endorsement during the term of the agreement. The 2002 Agreement provided that Gene Okerlund could terminate the Agreement if there would be a change in ownership or control of Orion. The 1997 Personality Endorsement Agreement had a covenant against competition clause prohibiting Gene Okerlund, for one year after the expiration of the Agreement, from rendering services to or permitting the use of his name or likeness by businesses which competed with Mean Gene's Units in the United States and Canada. The 2002 Personality Agreement did not have this one- year- after -expiration covenant against competition clause. An addendum to the 2002 Personality Agreement contains a covenant against competition effective "[d]uring this Agreement." Both the 1997 and 2002 Personality Endorsement Agreements were drafted by Orion.

In May of 1997 Orion submitted an application to the United States Patent and Trademark Office for a service mark registration for Mean Gene's Burgers in restaurant services. In April of 1998 Orion submitted an application to the United States Patent and Trademark Office for a service mark registration for Mean Gene's Burgers in franchising services. The service mark for Mean Gene's Burgers was registered by the United States Patent and Trademark Office for both restaurant and franchising services. It is undisputed that Orion did not receive the written consent of Gene Okerlund to register the service mark for Mean Gene's Burgers. Hot Stuff has filed Section 8 and 15 affidavits with the United States Patent and Trademark Office so that the registration of the Mean Gene's Burgers could become incontestable pursuant to 15 U.S.C. § 1065.

In March of 2003, Orion submitted an application to the United States Patent and Trademark Office for a service mark registration for Mean Gene's Pizza. The Patent and Trademark Office responded that if the name shown in the mark identifies a living individual, Orion must submit a written consent from that individual authorizing the applicant to register the name, or if the name did not identify a living individual, Orion should state so for the record. Counsel for Orion responded: "The name MEAN GENE identifies a living individual, namely, Gene Okerlund." Counsel also attached to the response a copy of the 1997 Personality Endorsement Agreement.

5

The United States Patent and Trademark Office replied that it must receive a proper response within six months to avoid abandonment. The Patent and Trademark Office explained:

> The applicant has stated for the record that the name appearing in the mark consist (sic) of a living individual. As such the applicant must provide a written consent to register the name as a trademark. The applicant has submitted as a written consent a "Personality Endorsement Agreement." However, said agreement does not provide the applicant with written consent to register the name as a trademark. *See Reed v. Bakers Engineering & Equipment Co.*, 100 USPQ 196, 199 (PO Ex. Ch. 1954)("Consent to register must be distinguished from consent to use. There may very well be consent to use without any consent to register. And neither is consent to register sufficient under the statute unless it is a written consent to register as specified in the statute.") Permission to use a mark in connection with specific goods without specific written consent to also register that mark does not give a party the right to register the subject matter as a trademark. *Garden v. Parfumerie Rigaud, Inc.*, 34 USPQ 30, 31 (Comm'r Pats. 1937)(granting petition to cancel registrations of marks that named and portrayed the petitioner, Mary Garden, who, although she had consented to the use of her name and portrait in connection with a particular perfume, had not given written consent to register the marks for perfumes and other cosmetic items. "Permission to use one's name and portrait in connection with a specified item of merchandise falls far short of consent to register one's name and portrait as a trade mark for such merchandise generally.")

Orion then abandoned the trademark application for Mean Gene's Pizza.

Although Hot Stuff has not produced a copy of the consent form, it contends that a consent form to register Mean Gene's Pizza as a trademark was given to Jeff Okerlund to present to Gene Okerlund. Jeff Okerlund does not recall being given any consent form and testified that he never requested of Gene Okerlund that he consent to Orion registering any Mean Gene's trademark. It is also uncontroverted that Orion never received the written consent of Gene Okerlund to register the the service mark for Mean Gene's Pizza.

Gene Okerlund testified that he was not aware that the trademark for Mean Gene's had been registered until 2004. Gene Okerlund testified that when he was approached about a written consent, he said, "I need to own the brand." Hot stuff acknowledges that no one from Orion told Gene Okerlund about the trademark registrations, but maintains that no one hid the registration of the trademarks from Gene Okerlund. Hot Stuff used the SM, TM or circle R designations on royalty

6

statements sent to Gene Okerlund, in the 2002 Personality Endorsement Agreement, and in Mean Gene's Burger and Pizza advertisements which were produced by Okerlund, Inc. Okerlund, Inc., is owned by Todd Okerlund, Gene Okerlund's son. Gene Okerlund is and was clearly aware of what those marks mean as he was involved in advertising for 12 years and in the using of such marks.

Jeff Okerlund was replaced as President of Orion in May of 2003 by Desmond Hague, and Jeff Okerlund then became Vice Chairman of Orion. A good relationship did not develop between Gene Okerlund and Desmond Hague. The marketing budget for the Mean Gene's products was reduced and Gene Okerlund believed that the Mean Gene's products were not receiving the attention they deserved. Under the Personality Endorsement Agreement, Gene Okerlund was allowed to terminate the Agreement by giving notice to Orion if there was a change in ownership or control of Orion. On March 8, 2006, after Orion had been sold to Allied Capital, Gene Okerlund terminated his Personality Endorsement Agreement with Orion.

Pursuant to the Personality Endorsement Agreement, after Gene Okerlund terminated the Agreement, Hot Stuff had the option of either terminating further development of the Mean Gene's Units and continuing to pay Gene Okerlund royalties through the expiration of the third party agreements for the operation of Mean Gene's Units pursuant to Section 7(a) of the Agreement or of continuing to pay royalties and initial license fees for new Mean Gene's licensees for two years after Gene Okerlund's death or incapacitation and then purchasing Gene Okerlund's rights under Section 7(b)of the Agreement. If Hot Stuff had elected the second option, under the terms of Section 7(b) of the Agreement, Hot Stuff and its licensees could then continue to use Mean Gene's name, picture, portrait, likeness, voice, personality, and all promotional and other materials in perpetuity. Hot Stuff elected to terminate further development of the Mean Gene's Units. After termination of the Personality Endorsement Agreement, Hot Stuff sent a letter dated March 28, 2006, and follow-up correspondence to the Mean Gene's Pizza operators proposing a conversion from Mean Gene's to a Stone Willy's Pizza program.

After Gene Okerlund terminated the Personality Endorsement Agreement he established a new company, Mean Gene's Enterprises, of which Gene Okerlund is the owner and chairman. The other owners are Todd Okerlund and Blaze Okerlund. At the time of the hearings in this matter, Mean Gene's Enterprises had employees but had not opened any locations or defined its business

plan. Gene Okerlund testified that Mean Gene's Enterprises did not intend to be in the franchising and licensing business, but planned on having an operating agreement with its partners. Mean Gene's Enterprises intended to target bars, taverns and bowling alleys as markets for its food products.

In a letter dated May 9, 2006, which contained the Mean Gene's Pizza trademark, and which was sent to the Mean Gene's Pizza Licensees, Mean Gene advised that he had "parted ways with Hot Stuff Food and taken matters into [his] own hands to create better products, better service, better margins and a better bottom line for you!" The letter described the services Mean Gene's Enterprises would be offering and stated that Mean Gene's Enterprises would be contacting them in the next couple of weeks with more details regarding the program. This lawsuit was then initiated by Hot Stuff.

## WHETHER THIS COURT SHOULD GRANT GENE OKERLUND'S MOTION FOR CANCELLATION OF MEAN GENE'S BURGER TRADEMARK REGISTRATIONS?

Gene Okerlund has moved this Court to cancel the trademark registrations for MEAN GENE'S BURGERS, Registration Nos. 2,188,577 and 2,327,876. Doc. 62. Gene Okerlund had filed in May and June of 2006 a petition and amended petition with the Patent and Trademark Office's Trademark Trial and Appeal Board to cancel the Mean Gene's Burgers trademark registrations. Hot Stuff and Gene Okerlund then submitted a stipulated combined motion requesting that the Trademark Trial and Appeal Board suspend its cancellation proceeding pending the outcome of the action before this Court.

While the Patent and Trademarks Office provides the primary means to secure cancellation of a trademark registration, a district court has concurrent power under Section 37 of the Lanham Act to order cancellation so that an entire controversy may be expediently resolved in one forum. *See Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 873 (3rd Cir. 1992). Cancellation of a trademark registration, however, is a discretionary matter for a district court. *See Gilbert/Robinson, Inc., v. Carrie Beverage-Missouri, Inc*, 989 F.2d 985, 993 (8th Cir. 1993).[3]

---

[3]In the *Gilbert/Robinson* case the Eighth Circuit Court of Appeals noted that a party seeking cancellation of a mark based on lack of a third party's consent under 15 U.S.C. § 1052( c) lacks standing. 989 F.2d at 990. The Court also concluded that the trademark owner's

15 U.S.C. § 1119 provides:

> In any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action. Decrees and orders shall be certified by the court to the Director, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby.

For a person to have standing to petition to cancel a registered mark, he need not prove actual damages but must show the likelihood of damage from the continuing registration of the mark. MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 20:46 (4th ed. 2006). Gene Okerlund has been unable to register the Mean Gene's mark due to the registration of the Mean Gene's Burger marks and has been sued for trademark infringement. Gene Okerlund is not a "mere intermeddler," *see Tonka Corp. v. Tonka Tools, Inc.*, 229 U.S.P.Q. 857 (T.T.A.B. 1986), and has met the requirements of the liberal rules for standing to petition to cancel a trademark registration. *See also Schnur & Cohan, Inc. v. Academy of Motion Picture Arts and Sciences*, 42 C.C.P.A 963, 223 F.2d 478 (1955)(when party is seeking to cancel registration of trade-mark of a name which has been used by him, action is grounded upon invasion of property right and damage is presumed).

A presumption of validity attaches to a registered trademark. *See* 15 U.S.C. § 1057(b). A party seeking cancellation must therefore rebut the presumption of validity by a preponderance of evidence. *See West Florida Seafood, Inc., v. Jet Restaurants, Inc.*, 31 F.3d 1122, 1125 (Fed. Cir. 1994). Since the Respondent in a cancellation proceeding has obtained substantial rights from the Government and may have built a large business around the registered mark, a registration should not be cancelled hastily and without careful study of the facts. MCCARTHY, § 20:64.

---

nondisclosure of the existence of a living individual was not material where the trademark owner would have obtained the named person's consent or would have refiled without consent after the named person's death, which occurred before the competitor seeking cancellation and damages for fraudulent nondisclosure began his infringing use. The case at hand does not involve a party seeking cancellation for the absence of  written consent of a third party, and the United States Patent and Trademark Office has established the materiality of the nondisclosure of a living individual by refusing to register the mark for Mean Gene's Pizza when the  Patent and Trademark Office had knowledge of the existence of a living individual but no consent from that individual.

Gene Okerlund seeks cancellation of the MEAN GENE'S BURGERS, Registration Nos. 2,188,577 and 2,327,876 on two grounds. Gene Okerlund first argues that cancellation is warranted due to violation of the Lanham's Act's requirement for written consent from living individuals as a prerequisite for registration. Gene Okerlund also argues that cancellation is warranted based on abandonment of the trademark due to the existence of a licensing agreement to use the trademark, since such licensing agreement is fundamentally inconsistent with ownership of the trademark.

Cancellation of a trademark registration is allowed at "any time"[4] if the registration was obtained contrary to the provisions of 15 U.S.C. § 1052(c). *See* 15 U.S.C. § 1064(3). 15 U.S.C § 1052(c) provides that no trademark shall be refused registration unless it "[c]onsists of or comprises a name, portrait, or signature identifying a particular living individual except by his written consent." The requirement for written consent under 1052( c) is intended to protect the rights of privacy and proprietorship of those who "'will be associated with the mark as used on the goods, either because that person is so well known that the public would reasonably assume the connection or because the individual is publicly connected with the business in which the mark is used.'" *Gilbert/Robinson, Inc., v. Carrie Beverage-Missouri, Inc,* 989 F.2d at 989 (*quoting Martin v. Carter Hawley Hale Stores, Inc.,* 206 U.S.P.Q. 931, 933 (T.T.A.B. 1979)). *See also* TRADEMARK MANUAL OF EXAMINING PROCEDURE § 1206.02 (3d ed. 2003). The written consent requirement of 1052( c) applies to a nickname if it identifies a particular living individual. *Reed v. Bakers Engineering & Equip. Co.,* 100 U.S.P.Q. 196, 199 (1954).

Hot Stuff has argued that the "Mean Gene" marks do not require written consent because these marks are not for Gene Okerlund as a living person, but the "Mean Gene" persona. Hot Stuff has further contended in these proceedings that Gene Okerlund is merely an actor playing the role of a character that has come to be known as "Mean Gene." However, this position is contradicted by its earlier response to the inquiry of the Patent and Trademark Office, where it stated, "The name MEAN GENE identifies a living individual, namely, Gene Okerlund." Also, Hot Stuff has

---

[4]A petition to cancel under 15 U.S.C. § 1064(1) and(2) must be filed within five years from the date of the registration of a mark.15 U.S.C. § 1065 addresses incontestability of the right to use a mark under certain conditions after a registered mark has been in continuous use for five consecutive years subsequent to the date of registration.

characterized Gene Okerlund as a television announcer who has gained a "measure of celebrity as the voice of the World Wrestling Entertainment."Doc. 4. This Court, after hearing the testimony and viewing the exhibits, rejects the argument that 1052( c) does not apply because "Mean Gene" does not identify a living individual. Instead, "Mean Gene" does identify a living individual.

In *Reed v. Bakers Engineering & Equipment Co.*, the Chief Examiner, in an appeal from a decision dismissing a petition to cancel a registration, characterized the written consent requirement of 1052( c) as follows:

> The statute requires the written consent of a particular individual in certain cases and if this written consent does not exist in those cases in which it is required there can not be any registration. The only material question involved is whether this is a case where the written consent of a particular individual is required. Consent to register must be distinguished from consent to use. There may very well be consent to use without any consent to register. And neither is consent to register sufficient under the statute unless it is a written consent as specified in the statute.

100 U.S.P.Q. at 199. *See also Krause v. Krause Publications Inc.*, 76 U.S.P.Q.2d 1904, 1913 (2005) (no implied consent to register trademark when no documents state that name of cancellation petitioner is the property of the respondent); *In re New John Nissen Mannequins*, 227 U.S.P.Q. 569, 571 (1985)(Even if record establishes consent to use name as part of trade name, such consent does not qualify as written consent to register.); *Laub v. Industrial Dev. Lab., Inc.*, 121 U.S.P.Q. 595 (1959) (registration refused when no written consent was given although applicant contended that the opposer had, by his actions, consented to use of trademark).

In support of its position that consent to register impliedly exists based on the parties' conduct and their written agreements, Hot Stuff cites to *In re D.B. Kaplan Delicatessen* 225 U.S.P.Q. 342 (T.T.A.B . 1985). Although the Trademark Trial and Appeal Board in that case concluded that provisions in an agreement satisfied the written consent requirement of 1052( c), the Trademark Trial and Appeal Board stated that the provisions were "beyond a mere 'consent to use' situation." 225 U.S.P.Q. at 344. The "buy out " agreement in the *Kaplan* case provided in pertinent part that the trade name and service mark of D.B. Kaplan Delicatessen as well as any name or mark confusingly similar to it was the property of D.B. Kaplan Delicatessen, Inc. or any assignee, and that Kaplan could not use the trade and service mark in any subsequent business.

11

The agreements in the case at hand, however, provide a consent to use situation. In both the 1997 and 2002 Personality Endorsement Agreements, Gene Okerlund granted Orion "the exclusive right to use the 'Mean Gene's name, personality, picture, portrait, likeness, voice and endorsement" for the term of the agreement. The 2002 Personality Endorsement Agreement in Section 7(b) gave Orion the post-termination option of continuing to pay royalties and initial license fees for new initial-term Mean Gene's licenses and "thereafter purchase all of Endorser's rights thereunder." If Hot Stuff had elected that option, Hot Stuff and its licensees would have been able to "continue to use Endorser's name, picture, portrait, likeness, voice and personality, and all promotional and other materials created hereunder in perpetuity," and the registration of the trademark may have been a moot point. Hot Stuff, however, did not elect this option. In the absence of an equitable consideration justifying a different conclusion, immediate cancellation of the trademark registrations for Mean Gene's Burgers would be warranted for violation of the Lanham Act's requirement of written consent from living individuals as a prerequisite for registration.

Hot Stuff argues that Gene Okerlund should be prevented by equitable principles from raising this "eleventh-hour protest." The equitable principles of laches, estoppel and acquiescence[5], where applicable, may be considered and applied in all inter partes proceedings in trademark cases[6]. *See* 15 U.S.C § 1069. The Eighth Circuit Court of Appeals has characterized the defense of laches as follows:

> Laches is an equitable defense. The doctrine, therefore, is flexible; no fixed or arbitrary period of time controls its applicability. *E.g., Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 805-806 (8th Cir. 1979). In determining whether the doctrine of laches should bar a lawsuit, all the particular circumstances of each case must be considered, including the length of delay, the reasons for it, its effect on the defendant, and the overall fairness of permitting the plaintiff to assert his or her action.

*Citizens and Landowners Against the Miles City/New Underwood Powerline v. Secretary, U.S. Dept.*

---

[5]Laches denotes passive consent while acquiescence denotes active consent. *Coach House Restaurant, Inc., v. Coach and Six Restaurants, Inc.*, 934 F.2d 1551, 1558 (11th Cir. 1991).

[6]At the completion of the August 4, 2006, hearing, this Court asked the parties to submit briefs on the impact considerations of equity, particularly unclean hands, may have on this action.

12

*of Energy,* 683 F.2d 1171, 1174 (8th Cir. 1982).

In this case, Hot Stuff acknowledges that no one from Orion told Gene Okerlund about the Mean Gene's Burgers trademark registrations. Hot Stuff maintains that as a sophisticated businessman Gene Okerlund would have been aware of the registrations when he saw SM, TM or Circle R designations on royalty statements, in the 2002 Personality Endorsement Agreement and in Mean Gene's Burger and Pizza advertisements produced by Okerlund, Inc. Gene Okerlund testified that when he noticed the mark behind the Mean Gene's Pizza in 2004, he asked Tim Schendel, the Operations Analysis Manager for Hot Stuff, what the mark was, and Schendel responded that it was "probably to protect you, or protect the company." Defendants point out that Schendel was called to testify twice after Gene Okerlund testified about the conversation and he never refuted the testimony. The Court finds that Gene Okerlund is a sophisticated businessman who was one of the owners of an advertising agency for twelve years, and the Court cannot accept as true that Gene Okerlund "never noticed the trademark" designations. Nor can this Court accept as true that Schendel's explanation extinguished any concerns Gene Okerlund had or should have had regarding the trademark designations.

The Court cannot overlook, however, that from November of 1997 until termination of the contract in March of 2006, Gene Okerlund was operating under a written agreement which defined the rights of Hot Stuff with regard to the Mean Gene's name, personality, picture, portrait, likeness, voice and endorsement as an exclusive right to use for a specific term of years. In light of the terms of the Personality Endorsement Agreements, this Court cannot agree with Hot Stuff that Gene Okerlund "sat idly by"and watched Hot Stuff further its "ownership rights" in the Mean Gene's Burgers and Mean Gene's Pizza marks. Whatever rights Hot Stuff has exercised, with at least the passive consent of Gene Okerlund, have been limited in nature and time by the terms of the Personality Endorsement Agreements.

The written consent requirement of 1052( c) was applicable, but not met when the service mark for Mean Gene's Burgers was registered by the United States Patent and Trademark Office for both restaurant and franchising services. Pursuant to 15 U.S.C. § 1119 , the Court is ordering the cancellation of the service mark for Mean Gene's Burgers for both restaurant and franchising

13

services, and is certifying this order of cancellation to the Director of the Patent and Trademark Office so that an appropriate entry may be made upon its record. [7]

## WHETHER HOT STUFF IS ENTITLED TO PROTECTION OF ITS UNREGISTERED MEAN GENE'S PIZZA AND BURGERS MARKS?

In a cancellation proceeding, only the registration, not the mark is cancelled. *See* McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 20:68 (4th ed. 2006). Accordingly, Hot Stuff has argued that even if cancellation of its registered trademarks for Mean Gene's Burgers occurs, it does not impact its alleged common law trademark rights which arise from its exclusive use of the marks in commerce. Since Hot Stuff abandoned the registration of the Mean Gene's Pizza trademark, it has maintained that it was entitled to protection of the Mean Gene's Pizza trademark as a common law mark.

A trademark registration does not of itself create the underlying right to exclude. Although federal registration confers procedural and substantive advantages, "the absence of federal registration does not unleash the mark to public use." *Gilbert/Robinson, Inc., v. Carrie Beverage-Missouri, Inc*, 989 F.2d 985, 991 (8th Cir. 1993). At common law, ownership of trademark or trade dress rights is obtained by the seller's actual use of a symbol to identify and distinguish one's goods or service from those offered by others. McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16.1. Both the common law and the Lanham Act protect unregistered marks. *Gilbert/Robinson,* 989 F.2d at 991.

Registration of a mark is not a prerequisite for protection from trademark infringement under section 43(a) of the Lanham Act.15 U.S.C. § 1125(a). Section 43(a) contains two prohibitions[8] with

---

[7]Having determined that cancellation is warranted on the ground of failure to obtain written consent of the living individual, the Court need not consider Gene Okerlund's argument that cancellation is warranted based on abandonment of the trademark.

[8]Section 43(a)(1), 15 U.S.C. § 1125(a)(1) provides:
> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

14

respect to goods or services, a prohibition of false designations of origin and a prohibition of false descriptions or representations. An owner of a mark is entitled to injunctive relief if the use of that mark violates either prohibition and causes a likelihood of confusion among consumers. If, however, the use of that mark by another violates either prohibition and causes actual confusion, the owner is entitled to damages. *Co-Rect Products, Inc. v. Marvy! Adver. Photography, Inc.*, 780 F.2d 1324, 1329-1330 (8th Cir. 1985); *Warner Brothers v. Gay Toys, Inc.,* 658 F.2d 76, 79 (2d Cir.1981).

Only the owner of the trademark has standing to seek relief for common law trademark infringement. *Quabaug Rubber Co., v. Fabiano Shoe Co., Inc.*, 567 F.2d 154, 160 (1st Cir. 1977). Host Stuff contends that its exclusive use of the "Mean Gene" mark in commerce for the past eight years is the result of a bargained-for-right. Host Stuff further contends that although Gene Okerlund negotiated an " intricate deal regarding the use of his personality, " Okerlund never asked for terms that would preclude Hot Stuff from acquiring a common law trademark in the "Mean Gene" name. Hot stuff contends that it is now using the mark in 47 states and foreign countries and has done so with Okerlund's full cooperation and assistance, and that all of these facts show Hot Stuff's acquisition of common law trademark rights in the "Mean Gene" name.

Defendant Gene Okerlund contends however, that he, not Hot Stuff, is the owner of the Mean Gene's marks, and that the Personality Endorsement Agreements are licensing agreements. Defendant Gene Okerlund further contends that any independent rights Hot Stuff had with regard to the marks are lost or merged into the license.

In support of its position that the agreements are license agreements, Gene Okerlund relies

------

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15

on *Armour v. Commissioner of Internal Rev.*, 101 U.S.P.Q. 257 (Tax Ct. 1954). In the *Armour case*, Tommy Armour, a prominent professional golfer contracted to authorize his name to be used as a trade-mark on golf balls and golf clubs for a term of years in return for payments based on sales. In 1949 Tommy Armour consented to the use and registration of his name as a trade-mark "from this date forth." The Tax Court held that the substance of the entire transaction was that of a license not a sale.

In the  2002 Personality Endorsement Agreement Gene Okerlund gave Orion the exclusive right to the Mean Gene's marks for an initial term of five years. The agreement called for monthly royalty payments based on a percentage of sales, and allows Okerlund to terminate the agreement if there is a change in ownership.  The Addendum provides that Okerlund shall not render services to or permit the use of his marks on competing products "[d]uring this Agreement." There is no authorization for Orion to register the marks in either  Personality Endorsement Agreement. This Court agrees that the  Personality Endorsement Agreement constitutes a license, not an assignment.

Since the Personality Endorsement Agreement constitutes a license, the merger principle applies to this case. The merger principle provides: "A licensee's prior claims of any independent rights to a trademark are lost, or merged into the license, when he accepts his position as licensee, thereby acknowledging the licensor owns the marks and that his rights are derived from the licensor and enure to the benefit of the licensor." *Bunn-O-Matic Corp. v. Bunn Coffee Service, Inc.*, 88 F.Supp.2d 914, 54 U.S.P.Q.2d 1012, 1020 (C.D.Ill. 2000)( citing *National Council of Y.M.C.A. v. Flint Y.M.C.A.*, 229 U.S.P.Q. 32, 35-36 (E.D. Mich. 1985)).

The inconsistency of a claim of trademark ownership with the existence of a license was recognized by te Eighth Circuit in *A & L Labs., Inc. v. Bou-Matic LLC*, 429 F.3d 775 (8th Cir. 2005). In the *Bou-Matic* case, the parties disagreed as to who had ownership of numerous trademarks.  The agreements of the parties gave one of the parties a license to use the trademarks on the occurrence of certain events.  The district court held that if one of the parties had a license it clearly did not own the trademarks and no genuine issue of material fact existed on the question of trademark ownership. In affirming the district court, the Eighth Circuit stated, "If [Appellant] had owned the trademarks, it would not have needed [Appellee's] permission to use them." 429 F.3d at  781.

Defendants also rely upon the doctrine of licensee estoppel which provides that  a plaintiff-

16

licensee is estopped from contesting the validity of its licensor's marks. *See Heaton Distributing Co. v. Union Tank Car. Co.*, 387 F.2d 477, 482 (8th Cir. 1967), *cited in Seven-Up Bottling Co. v. Seven-Up Co.*, 561 F.2d 1275, 1279 (8th Cir. 1977). This doctrine applies even in the absence of any contractual provision preventing the licensee from contesting the validity of the trademark. *See Heaton Distributing Co.*, 387 F.2d at 482; *Sturgis Area Chamber of Commerce v. Sturgis Rally & Races Inc.*, 55 U.S.P.Q.2d 1077, 1082 (D.S.D. 2000). However, Licensor does not have and has not had a registered mark for "Mean Gene." Licensor does have the right to use the name "Mean Gene" and his likeness but for the contract limitation in the 2002 licensing agreement. Once the licensing agreement has run its course, then there will be no restriction on Eugene Okerlund using the name of "Mean Gene" or his likeness. This opinion does not deal with uses of likeness and name that are not prohibited by the 2002 agreement.

Any rights Host Stuff had with regard to the unregistered marks was merged into the 2002 license agreement, and that license agreement is inconsistent with trademark ownership. Being a licensee, not an owner of the marks, Hot Stuff, therefore, is not entitled to trademark protection outside of what exists in its license agreement under the common law .

Hot Stuff, however, in Count two of its complaint has alleged unfair competition under Lanham Act § 43(a), 15 U.S.C. § 1125. A licensee may use Lanham Act § 43(a) to sue its licensor. See MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 27:21; *Calvin Klein Jeanswear Co. v. Tunnel Trading*, 2001 WL 1456577 (S.D.N.Y.) (Not reported in F.Supp.2d).

Although Defendants contend that Hot Stuff is no longer an exclusive licensee, this Court does not agree. In interpreting a contract, this Court seeks to ascertain and give effect to the intention of the parties, and to find the intention of the parties, the Court relies on the contract language actually used. *Malcolm v. Malcolm*, 365 N.W.2d 863, 865 (S.D.1985). The entire contract and all its provisions must be given meaning if that can be accomplished consistently and reasonably. *Dail v. Vodicka*, 237 N.W.2d 7, 9 (S.D. 1975). If provisions conflict and full weight cannot be given to each, "the more specific clauses are deemed to reflect the parties intentions-a specific provision controls a general one." *State v. Greger*, 559 N.W.2d 854, 864 (S.D. 1997).

The post termination provision in Section 7(a) provides that upon termination of the 2002 Agreement, Hot Stuff shall:

> Terminate further development of Mean Gene's Units, and continue to pay royalties to Endorser (i) pursuant to Section 4(a)(i) through the expiration of third-party agreements for the operation of Mean Gene's units which are in effect on the date of such expiration or termination; and (ii) pursuant to Section 4(b)(i) for as long as any applicable Orion-operated Units continue in operation. Thereafter, all other rights, duties and obligations of the parties shall cease.

The payment of royalties by Hot Stuff pursuant to 4(a)(i) of the 2002 Agreement is in consideration of "the full performance of all obligation, by Endorser." In the Addendum to the 2002 Agreement, Gene Okerlund agreed that "[d]uring this Agreement, Endorser shall not render service to or authorize or permit the use of Endorser's name, picture, portrait, likeness, voice, or endorsement for or on behalf of, or in connection with, products which compete with Orion Food Product or businesses which compete with Mean Gene's Units."

The parties are still operating under the 2002 Agreement under 7(a). It is a reasonable and consistent construction of the entire contract to conclude that payment of royalties at the same rate as before the application of 7(a) would be accompanied by the same requirements of exclusivity. Contrary to what Defendants argue, it is of no significance that the a Mean Gene Unit licensee has no exclusive or limited geographical territory under the License Agreements.

A licensee may pursue a false designation and description claim under 15 U.S.C. § 1125(a). *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.*, 567 F.2d 154, 160(1st Cir. 1977). Any person who "believes that he or she is or is likely to be damaged" by the use of a mark in interstate commerce which is likely to cause confusion or to deceive purchasers concerning the source of the goods may bring a civil action if there is a sufficient nexus between the plaintiff and the alleged conduct. *Id.* at 160. An exclusive licensee, such as Hot Stuff, who believes it is likely to be injured by its Licensor's use of the identical trademark for which it is paying royalties has established standing to sue for false designation of origin under 15 U.S.C. § 1125(a).

In order to prove a claim under Section 43(a), 15 U.S.C. § 1125(a), for false designation of origin and false description, Hot Stuff must show (1) that its trademark may be protected and (2) that the relevant group of buyers is likely to confuse the Defendants' products or services with those of Hot Stuff. *See Forum Corp. of North America v. Forum LTD.*, 903 F.2d 434, 439 (7th Cir. 1990).

Unlike  descriptive marks, arbitrary or fanciful marks, which are inherently distinctive are entitled to immediate trademark protection, without establishing secondary meaning. *Co-Rect Products, Inc. v. Marvy! Adver. Photography, Inc.*, 780 F.2d at 1329, *citing Miller Brewing Co. v. G. Heilman Brewing Co.*, 561 F.2d 75, 79 (7th Cir. 1977). The Court finds that the Mean Gene's marks are inherently distinctive.

In *SquirtCo v. Seven-Up Co.*, the Eighth Circuit discussed  the following factors to be assessed in determining likelihood of confusion:

> A strong and distinctive trademark is entitled to greater protection than a weak or commonplace one. *See J.B. Williams Co. v. Le Conte Cosmetics, Inc.*, 523 F.2d 187, 192 (9th Cir. 1975), cert. denied, 424 U.S. 913, 96 S.Ct. 1110, 47 L.Ed.2d 317 (1976). Similarity is based on an examination of the marks as a whole, including visual impression and sound. *David Sherman Corp. v. Heublein, Inc.*, 340 F.2d 377, 380 (8th Cir. 1965). Where the products are closely related, less similarity in the trademarks is necessary to support a finding of infringement. *Id*. Competitive proximity is one factor to be considered, even though infringement may be found in the absence of direct competition. *HMH Publishing Co. v. Turbyfill*, 330 F.Supp. 830 (M.D.Fla.1971). Intent on the part of the alleged infringer to pass off its goods as the product of another raises an inference of likelihood of confusion, but intent is not an element of a claim for trademark infringement. *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 157-58 (9th Cir.), *cert. denied*, 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963). Likewise, actual confusion is not essential to a finding of trademark infringement, although it is positive proof of likelihood of confusion. *Standard Oil Co. v. Standard Oil Co.*, 252 F.2d 65, 74 (10th Cir. 1958). ... "(I)n a trademark infringement action the kind of product, its cost and the conditions of purchase are important factors in considering whether the degree of care exercised by the purchaser can eliminate the likelihood of confusion which would otherwise exist." *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons, supra*, 523 F.2d at 1342.

628 F.2d 1086, 1091(8th Cir. 1980).

The ultimate determination of likelihood of confusion is not to be mechanically determined through rigid application of the *SquirtCo*  factors, but since the inquiry is case-specific, different factors may be accorded more weight in different cases. *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1054 (8th Cir. 2005). In addition, the factors are not entirely separable. *Id*.

In the case at hand, the Mean Gene's mark is strong and distinctive. The Mean Gene's Pizza

trademark that was used in the May 9, 2006, letter to Hot Stuff's licensees was identical to the mark used by Hot Stuff. The mark even contains the TM. The products, pizza, burgers and other food products are closely related, and the parties are in direct competition.

Regardless of Defendants' claimed intent, the nature of the May 9, 2006, letter and the fact that it was sent to Hot Stuff's licensees is evidence of an intent to deceive or indifference to the likelihood that the use of the Mean Gene's trademark would deceive. An "inference of intent is strengthened when the parties have had a prior relationship, because ' [s]uch a relationship provides evidence of the alleged infringer's intent to trade on the plaintiff's good will.' " *Insty\*Bit, Inc. v. Poly-Tech Indus., Inc.*, 95 F.3d 663, 671 (8th Cir. 1996), *quoted in Sturgis Area Chamber of Commerce v. Sturgis Rally & Races Inc.* 55 U.S.P.Q.2d 1077, 1083 (D.S.D. 2000). In this case, the parties have an ongoing relationship under Section 7(a) of the 2002 Agreement.

Evidence was presented in this case of actual confusion. Lisa Westbberg, the contract compliance officer for Hot Stuff testified that after the May 9, 2006, correspondence was sent to Hot Stuff's licensees, the licensees communicated confusion about the validity of their contract, who their contract was with, whether Hot Stuff had an affiliation with Mean Gene's Enterprises, from whom they should purchase products, and about who would continue to service their accounts. Although the relevant group of buyers may include at least some sophisticated business people, given the nature of the marks and market, and the reaction to the May 9, 2006, correspondence from Mean Gene's Enterprises, it is doubtful that the normal degree of care exercised by the purchaser can eliminate the likelihood of confusion.

Of all of the factors considered, the sophistication of the buyers is the only factor which does not clearly weigh in favor of finding a likelihood of confusion. In considering all of the factors, this Court finds a likelihood of confusion. Hot Stuff, therefore, has proven its claim under Section 43(a), 15 U.S.C. § 1125(a), for false designation of origin and false description. The Court must now determine whether a permanent injunction should issue, and if so, the scope of the injunction.

The standard for a preliminary and permanent injunction is essentially the same, except that for permanent injunction, the plaintiff must show actual success on the merits. *See Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 546 n. 12 (1987). In deciding whether to grant the injunction, this Court must then consider: (1) Plaintiff's success on the merits; (2) The threat of

20

irreparable harm to the movant; (3) The balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) Whether the issuance of an injunction is in the public interest.

A considerable threat of irreparable harm to Hot Stuff was established from the evidence of actual confusion that occurred after the May 9, 2006, letter from Mean Gene's Enterprises was sent to Hot Stuff's licensees. In balancing the harm and the injury that granting the injunction will inflict on other interested parties, the Court acknowledges that Gene Okerlund will suffer damage from the restriction on the use of his name if a permanent injunction is issued, but that damage can be restricted by tailoring the scope and the length of the injunction. In addition, by this Court's interpretation of the 2002 Agreement and the effect of Section 7(a), Okerlund's contractual obligation already imposed certain limitations on Gene Okerlund's use of his nick name, and the Court does not believe the harm from the restriction on the use of the nick name is greater than the harm done to Hot Stuff because of the Section 43(a) violation.

The public interest is the final factor to be considered in determining whether to issue a permanent injunction. In a trademark case, the courts have defined the public interest as the right of the public not to be deceived or confused. *Sturgis Area Chamber of Commerce v. Sturgis Rally & Races Inc.* 55 U.S.P.Q.2d 1077, 1086 (D.S.D. 2000). In this case the Court finds that the public interest will be served by an injunction which eliminates confusion as to the source of origin of the Mean Gene's Pizzas and Burgers.

In determining the scope of the injunction in a trademark case, the Court must consider the manner in which the plaintiff is harmed, the means by which such harm can be avoided, the viability of the defenses raised, and the burden the injunction would impose upon the defendant and the potential effect the injunction would have upon lawful competition between the parties. *See* McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 30.3. In light of these considerations the Court will issue a permanent injunction enjoining Gene Okerlund and Mean Gene's Enterprises from using the Mean Gene's Burger and Mean Gene's Pizza name and the pictures and portraits which have been utilized by Hot Stuff in advertising Mean Gene's Burger and Mean Gene's Pizza during the time the Personality Endorsement Agreements have been in place, and the permanent injunction will be in place for so long as Gene Okerlund is paid royalties pursuant to Section 7(a)

21

of the 2002 Personality Endorsement Agreement for Mean Gene's units or entities that were in operation under the 2002 agreement on March 8, 2006.

## WHETHER HOT STUFF IS ENTITLED TO INJUNCTIVE RELIEF WITH REGARD TO ITS RESTRICTIVE COVENANTS WITH ITS FORMER EMPLOYEES, MARK MCKEE AND BLAZE OKERLUND?

<u>Mark KcKee</u>

Defendant Mark McKee worked in sales for Hot Stuff from January of 2002 until March of 2005, when his employment as director of development was ended without cause. On January 28, 2002, McKee entered into an Employee Confidentiality, Patent and Noncompetition Agreement. Section 3.1 of that Agreement provides that during the term of McKee's employment and for 24 months after termination of employment, McKee would not:

> (i)engage in or assist others to engage in or have any interest in any business which competes with the Company in the Area assigned to Employee, (ii) solicit competing business from, or contact, anyone who has been a customer of the Company in the Area assigned to Employee, or (iii) engages in any business or activity which competes with the Company and for which Employee uses, discloses or infringes upon the Company's trade secret rights or Confidential Information.

The area assigned to McKee in the 2002 Agreement was Kansas, Missouri, and the surrounding areas.

When McKee left Hot Stuff's employment he negotiated severance pay and eventually signed a Separation Agreement which provides: "The Company shall pay to Employee an additional severance benefit of four (4) weeks as full payment, comprise (sic) and settlement of all non-vested compensation, and as additional consideration for the restrictive covenants of the business." In April or May of 2006, McKee accepted employment with Mean Gene's Enterprises. McKee testified that "we" sent out the May 9, 2006, letter sent to the Mean Gene's Pizza Licensees after Hot Stuff had sent out its March 28, 2006, letter offering conversion, which letter McKee found disparaging to Mean Gene. At the bottom of the May 9, 2006, letter is the notation: "To get any immediate questions answered, please feel free to contact Mark McKee at ... ." McKee testified that he received nine or ten telephone calls regarding the letter.

McKee contends that his Confidentiality and Noncompetition Agreement was superseded and replaced by the 2006 Separation Agreement. He bases his position on Section 2 of the 2006 Separation Agreement. Section 2 states: "This Agreement constitutes and contains the entire agreement and understanding concerning Employee's employment with Employer and separation thereof, and the subject matters addressed herein between the parties, and supersedes and replaces all prior negotiations and all prior agreements proposed or otherwise, whether written or oral, concerning the subject matter hereof."

McKee contends that even if the Confidentiality and Noncompetition Agreement is enforceable it only restricts McKee from competing in Kansas and Missouri. McKee suggests that a one-year period instead of a two-year period for the restrictive covenants would be reasonable.

McKee also proposes a novel theory that noncompete agreements are illegal and void under S.D.C.L. § 60-8-4 and S.D.C.L. § 53-9-1, a criminal statue that prohibit agreements curtailing the right to work and a statute providing that a contract provision contrary to law is unlawful.[9] The South Dakota state courts have not considered this theory. There are other states with right to work laws and no case has been cited where those right to work laws have been so interpreted. The history of right to work law in South Dakota is as an anti labor Union law. This Court does not believe that the South Dakota Supreme Court would invalidate noncompete agreements with the right to work law.

Under South Dakota law any contract restraining exercise of a lawful profession, trade, or business is void to that extent, except as provided by the statutory exception in S.D.C.L. §§ 53-9-9 to 53-9-12. S.D.C.L § 53-9-8 . The applicable statutory exception in this case, S.D.C.L § 53-9-11,

---

[9]SDCL § 60-8-4 provides:
> Any agreement relating to employment, whether in writing or oral, which by its stated terms, or by implication, interpretation, or effect thereof, directly or indirectly denies, abridges, interferes with, or in any manner curtails the free exercise of the right to work by any citizen of the state of South Dakota, is a Class 2 misdemeanor.

S.D.C.L. § 53-9-1 provides: "A contract provision contrary to an express provision of law or to the policy of express law, though not expressly prohibited or otherwise contrary to good morals, is unlawful."

provides:

> An employee may agree with an employer at the time of employment or at any time during his employment not to engage directly or indirectly in the same business or profession as that of his employer for any period not exceeding two years from the date of termination of the agreement and not to solicit existing customers of the employer within a specified county, first or second class municipality, or other specified area for any period not exceeding two years from the date of termination of the agreement, if the employer continues to carry on a like business therein.

Although S.D.C.L § 53-9-11 generally allows employers and employees to make their agreements without making a further showing of reasonableness, for those employees who are fired through no fault of their own, the trial court must balance the competing interests of the former employee, the employer, and the public to determine whether the noncompete agreement is reasonable. *Central Monitoring Serv., Inc. v. Zakinski,* 553 N.W.2d 513, 519-21 (S.D. 1996).

An agreement not to disclose information or solicit, unlike a covenant not to compete, is free from challenge as a general restraint on trade. However, such covenants are strictly construed and enforced only to the extent reasonably necessary to protect the employer's interest in confidential information. *1st American Systems, Inc. v. Rezatto,* 311 N.W.2d 51, 57 (S.D. 1981). Employment contract nondisclosure clauses are not enforced if (1) if a trade secret or confidential relationship does not exist; (2) the employer discloses such information to others not in a confidential relationship; and (3) such information is legitimately discovered and openly used by others. *Id.; See also, Walling Chemical Co. v. Bigner,* 349 N.W.2d 647, 650 (S.D.,1984).

The Court adheres to the following principles of South Dakota law when construing a contract:

> When construing a contract, the court must ascertain and give effect to the intention of the parties. *Malcolm v. Malcolm,* 365 N.W.2d 863 (S.D.1985). That intention is found in the contract language. *Id.* Unless the language is ambiguous or a different intention is manifested, the language in a contract is to be given its plain and ordinary meaning. *See* Restatement (Second) of Contracts § 202(3) (1981). Whether contract language is ambiguous is a question of law. *Enchanted World Doll Museum v. Buskohl,* 398 N.W.2d 149 (S.D.1986). Language is ambiguous when a genuine uncertainty exists as to which of two or more meanings is correct. *North River Ins. Co. v. Golden Rule Constr., Inc.,* 296 N.W.2d 910 (S.D.1980).

24

*American State Bank v. Adkins* 458 N.W.2d 807, 809 (S.D.1990).

This Court does not find the 2006 Separation Agreement to be ambiguous, and this Court rejects McKee's contention that his Confidentiality and Noncompetition Agreement was superseded and replaced by the 2006 Separation Agreement. The "subject matter" of the 2006 Separation Agreement is the severance pay McKee had negotiated, and the provision in Section 2 that the 2006 Separation Agreement supersedes and replaces all prior negotiations and all prior agreements proposed or otherwise, refers to the prior negotiations and prior agreements regarding severance pay.

Since McKee was not fired for cause, this Court has balanced the competing interests of the former employee, the employer, and the public to determine whether the noncompete agreement is reasonable. The Court finds that a two-year noncompete agreement applicable to Kansas, Missouri, and the surrounding areas is reasonable. The Court further finds that by taking part in  sending the May 9, 2006, letter to all of the Mean Gene's Pizza Licensees, McKee violated the noncompete agreement.

The Court has considered the factors applicable in the determination of whether a nondisclosure agreement should be enforced and finds no factor present that would preclude the Court from enforcing the nondisclosure agreement. The  Court finds the   2-year term of the disclosure to be reasonably necessary to protect Hot Stuff's interest in confidential information. The Court further finds that since customer lists are included in the nondisclosure agreement's definition of confidential information, McKee has violated the nondisclosure agreement.

In order for this court to grant a permanent injunction, the plaintiff must show that it will suffer irreparable harm if the injunction is not granted. *See Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 546 n. 12  (1987) (standard for preliminary and permanent injunction is essentially the same, except for permanent injunction plaintiff must show actual success on the merits); *U.S. v. Green Acres Enterprises, Inc.*  86 F.3d 130, 132 -133 (8th Cir. 1996); *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (en banc) (irreparable harm is element of preliminary injunction). The Court has carefully considered and applied the balancing factors explained in *Dataphase Sys., Inc. v. C.L. Sys., Inc.*,: (1) the threat of irreparable harm to plaintiff; (2) the state of the balance between this harm and the injury that granting the permanent injunction

25

will inflict on this defendant; (3) plaintiff's success on the merits; and (4) the public interest.

The threat of irreparable harm to the Plaintiff if the Confidentiality and Noncompetition Agreement is not enforced is greater than the harm and injury done to this Defendant by requiring him to abide by the terms of his Agreement. The Court further finds that the public interest is promoted by requiring compliance with the terms of contracts. The Court determines that the balancing of these factors in the present case weighs in favor of the plaintiff and a preliminary injunction will be granted prohibiting McKee from violating  his Confidentiality and Noncompetition Agreement .

Blaze Okerlund

Blaze Okerlund is an officer, director and shareholder of Mean Gene's Enterprises who was formerly employed by Hot Stuff as executive vice-president of operations and new development. Blaze Okerlund was terminated without cause from Hot Stuff effective April 3, 2005. Blaze Okerlund  received severance pay of $150,000, and a continuation of health and dental benefits subject to his execution of a Confidentiality, Employee Non-Solicitation, Non-Competition Agreement. Paragraph 3 of the Confidentiality, Employee Non-Solicitation, Non-Competition Agreement provides that for two years after the termination of his employment Blaze Okerlund "shall not directly or indirectly, on his behalf or on behalf of others, divert, solicit, or take away, or attempt to divert, solicit, or take away the patronage of any customers of [Hot Stuff] with which [Blaze Okerlund] had contact during the term of [his] employment by Hot Stuff."

The Agreement Not to Compete in paragraph 6 of the Confidentiality, Employee Non-Solicitation, Non-Competition Agreement provides that Blaze Okerlund shall not for two years after the termination of his employment engage in any business or enterprise which is a "Competing Business." The Agreement defines Competing Business as a "business which manufactures and/or distributes proprietary lines of food, supplies and/or equipment for use in preparing branded food products for sale in 'business within a business' franchisee operations."

If the meaning of contractual language is plain and unambiguous, construction is not necessary. *Ziegler Furniture and Funeral Home, Inc. v. Cicmanec*, 709 N.W.2d 350, 354 (S.D. 2006). Neither Hot Stuff nor  Blaze Okerlund  contends the Confidentiality, Employee Non-Solicitation, Non-Competition Agreement is ambiguous, and the Court does not find it to be

26

ambiguous. The Court has ascertained the intent of the parties from the language of the Agreement, not from what some may think the spirit of the Agreement was. The Court finds the noncompete clauses of the Confidentiality, Employee Non-Solicitation, Non-Competition Agreement reasonable, and the confidentiality sections of the Agreement to be enforceable.

Blaze Okerlund's name does not appear on the May 9, 2006, letter from Mean Gene's Enterprises which was sent to Mean Gene's Pizza's Licensees, and no evidence was presented that he took part in sending the letter. In addition, there is scant evidence that Blaze Okerlund had contact with any of the Licensees who received the letter.[10] Further, Blaze Okerlund testified that he has not and does not intend to engage in any business that sells or intends to sell food, supplies and/or equipment to "business within a business" franchisee operations. As such, the Court does not find that Blaze Okerlund breached the Agreement.

Accordingly,


**IT IS ORDERED**:

1.   That Gene Okerlund's Motion to Cancel Trademark Registrations for Mean Gene's Burgers (Doc. 62) is granted, and the cancellation of the service mark for MEAN GENE'S BURGERS, Registration Nos. 2,188,577 and 2,327,876 for both restaurant and franchising services is ordered, and this order of cancellation is certified to the Director of the Patent and Trademark Office so that an appropriate entry may be made upon its records;

2.   That the Order Granting Preliminary Injunction in part with regard to Mean Gene's Burgers is vacated.

3.   That Plaintiff's request for Permanent Injunctive Relief with regard to unfair competition under Lanham Act § 43(a), 15 U.S.C. § 1125, is granted to the extent that Gene Okerlund and Mean Gene's Enterprises are enjoined from using the Mean Gene's Burger and Mean Gene's Pizza name and the pictures and portraits which have been utilized by Hot Stuff in advertising the Mean Gene's Burger and Mean Gene's Pizza during the time the Personality Endorsement Agreements have been in

---

[10] Although Lisa Westbberg, the contract compliance officer for Hot Stuff, stated in her affidavit (Doc. 3, Ex. B) that Pat Luna, a Hot Stuff licensee, advised her that Blaze Okerlund had contacted him and represented that Hot Stuff had no rights to continue operating as Mean Gene's and that Luna could continue with the Mean Gene's brand through Luna, Luna was never called as a witness in these proceedings.

place, and the permanent injunction will be in place for so long as Gene Okerlund is paid royalties pursuant to Section 7(a) of the 2002 Personality Endorsement Agreement for Mean Gene's units or entities that were in operation under the 2002 agreement on March 8, 2006.

4.    That Plaintiff's request for Permanent Injunctive Relief with regard to its claimed common law trademark is  denied;

5     That Mark McKee is enjoined from engaging in conduct which violates the terms of his Confidentiality and Noncompetition Agreement with Hot Stuff as is set forth in this Memorandum Opinion; and

6.    That Plaintiff's request for Permanent Injunctive Relief against Blaze Okerlund is denied.

Dated this 13ᵗʰ day of December, 2006.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK
BY: _____
(SEAL)        DEPUTY

28